Dey v. Codman.

for the reasons before given, be passed upon in these proceedings in the orphans court.

In the case of *Hunt* v. *Mayberry, 5 Dutch. 403*, it was said in reference to the nineteenth section of the act of 1855 (*Rev. p. 778 § 118*), that the design of the legislature was not to confer on the orphans court all the powers the court of chancery has over cases of administration, guardianship and trusts, but to give a new jurisdiction, or rather to enlarge the jurisdiction, over a class of persons already subject to the power of the court. So, in the legislation under consideration, the intention of the legislature was to confer certain powers, and certain powers only, on the orphans court, and not all the powers which the court of chancery would have over the subject.

So much of the order appealed from as charges the accountant with the amount of the Cook loan and interest, will be reversed, together with the direction to the trustee in connection therewith. So, also, will the award of costs. The accountant should, in the orphans court, pay only the costs of those of her exceptions to the master's report which were not sustained in the orphans court; the rest of the costs of the exceptions should be paid out of the estate. In all other respects the order will be affirmed. The accountant is entitled to costs of both appeals.

----

J. WARREN S. DEY, appellant,

*v.*

JOHN CODMAN et al., executors of ANTHONY DEY, deceased, respondents.

1. Where executors were not chargeable with the deficiencies arising from the foreclosure and sale of premises under mortgages belonging to the estate, they were allowed therefor in their final account, they having been charged with the full amount of those mortgages in their first account.

2. *Held, also,* that they were not chargeable with the amount of a mortgage which was satisfied during their testator's lifetime, but canceled of record by them after his death.

Dey v. Codman.

3. They were allowed for taxes paid and for repairs and improvements made on the testator's homestead after his widow ceased to reside therein. By the terms of the will, the executors held it in trust for her and her daughters to live there while they were unmarried, for their natural lives, with a provision that they might sell in certain contingencies, which power was not exercised until ten years after the widow's death.—*Held, also,* that she should have paid the taxes and costs of repairs and improvements while occupying it, and also after she ceased to occupy it but received the rents therefrom.

4. They were allowed for traveling expenses actually incurred and paid by them, and also the amount of a salary paid to an agent employed by them about the business of the estate, such amount having been taken into consideration in fixing their commissions.

5. They were allowed for payments of certain municipal assessments levied on lands of the estate, although the statute under which similar assessments were laid was afterwards declared by the courts to be unconstitutional; and also for other municipal assessments subsequently paid by them in good faith and with discretion.

6. They were held not liable for refusing an offer of $30,000 for certain lots of the estate which had been valued by a reputable local expert at $95,000, and shortly afterwards, at their request, with a view to fixing a price which would invite buyers, at $65,000, although the lots were afterwards, in order to close the estate and to pay certain assessments thereon which the estate had no funds in hand to pay, bought in at public sale for $1,470, under an agreement by all those interested, (including the executors,) except the appellant, whose interest is one thirty-second part. The agreement was to sell for the best price obtainable, and if one R. should buy he should hold the lands in trust, to be divided among the parties. The sale was extensively advertised and R. was the successful bidder, and the lots were divided accordingly. The value of all lands greatly depreciated by the panic of 1873, after the $30,000 were offered for the lots.—*Held, also,* that they were not liable for a loss sustained on a sale of the homestead through the same causes, its value being also affected by the existence of the testator's surviving daughters' contingent right to occupy it.

7. They were allowed for the payment of a commission of $300 to a broker who secured a purchaser for them of part of the testator's lands for $15,000.

8. They were held not liable for the non-collection of deficiencies on the sale of mortgaged lands, there being no proof that those deficiencies could in any case have been collected.

9. They were allowed for counsel fees paid, where the services appeared to have been necessary and properly rendered. The question of the allowance for some of those professional services had been considered by the orphans court, when a former account was passed, and they were then allowed.

10. The entire amount of the cash on hand at the settlement of the first account was charged to them in the second account as cash on hand, without deducting therefrom the amount of the commissions due them as fixed by the

Dey v. Codman.

court, and also the surrogate's fees on the first account. The second account. was rectified by making those deductions.

On appeal from decree of Hudson orphans court upon the final account of executors.

Mr. *William P. Wilson* and Mr. *W. C. Spencer,* for appellant..

Mr. *John Linn* and Mr. *Cortlandt Parker,* for respondents.

THE ORDINARY.

This is an appeal from the decree of the orphans court of Hudson county made upon the settlement of the final account of the executors of Anthony Dey, deceased, upon exceptions of the appellant to that account. The objections, which were numerous, were all overruled, but the court corrected the account by ordering the deduction of $68 from the amount of two items charged under date of July 28th, 1869, and of $28.08 from the charge of $604.17, under date of May 8th, 1874, and reduced the amount of commissions, as stated by the surrogate in the account, from $1,178.66 to $467.17, and fixed the balance in the hands of the executors for distribution at $605.63.

The grounds of the appeal are the following: First and second.. Because the court did not decree that the balance ($6,565.16) brought forward from a former account settled on July 14th, 1869, was not the true balance in the hands of the executors, and because the court did not charge the executors with the amount of the balance as shown by the account, $32,652.62. Third.. Because the court did not decree that the charge of the amount of the inventory in the account of 1869 was not incorrect, the appellant insisting that the decree should have charged, in addition to the amount of the inventory, the amount of a mortgage for $6,921.61, dated August 1st, 1853, and given by Edgar M.. Smith to the testator, Anthony Dey. Fourth. That the court did not decree that the executors were not entitled to an allowance for money paid to the wife of the testator out of the capital of the estate, but allowed for those moneys. Fifth. That the

court did not decree that the executors were not entitled to an allowance of all sums of money in excess of $600 a year (presumably reference is made to payments to the widow of the testator) before they invested the sum of $10,000 for her, as directed by the will, but, on the other hand, allowed such sums. Sixth. That the executors were allowed for payments made on account of the testator's homestead after the widow ceased to reside there, she having, after leaving, rented it and received the rents thereof, and repairs and improvements having been made at the expense of the estate; the appellant insists that the executors should have taken charge of and rented the property for the benefit of the estate so soon as she ceased to reside there. Seventh. That the court allowed the salary paid to Anthony Dey, Jr., for his services as agent of the executors, and allowed, also, for traveling expenses. Eighth. That the court allowed, in the account, the amount of assessments on lands in East Newark, owned by the estate, paid by the executors, as follows: In 1872, $795.02; in 1874, $311.20; in 1876, $604.16. Ninth. That the court did not charge the executors with the loss occasioned to the estate by their refusal to accept a cash offer of $30,000 for the East Newark property, which they afterwards sold for $1,470. Tenth. That the court did not charge the executors with the loss occasioned by their selling the homestead for a grossly inadequate price, viz., $250, whereby there was a loss of over $14,750, besides interest. Eleventh. That the court allowed to the executors money paid to Caroline R. Bill, as follows: January 5th, 1870, $2,000, and April 17th, 1871, $1,300, which payments, the appellant insists, were contrary to the provisions of the will. Twelfth. That the court allowed the charge of $300 paid to T. P. Ranney as his commissions on a sale of land. Thirteenth. That it did not charge the executors with the loss occasioned to the estate, as alleged by the appellant, by their failure to collect the deficiency on the sales of mortgaged premises on the bonds held by the estate, which the mortgages were given to secure. Fourteenth. That the court allowed certain counsel fees without showing what the services were for which they were paid. Fifteenth. That the court allowed excessive commissions, and

Dey *v.* Codman.

did not decree that the two sums of $944.45, which appear by the account to have been paid July 28th, 1869, to the executors as commissions, should be disallowed.   Sixteenth.   That the accounts are incomplete, fragmentary and unintelligible.   Seventeenth. · That the court did not decree that the sales made by the executors (presumably referring to the sales of the East Newark property and the homestead made to. Edward C. Richards) were *not* illegal; and, Eighteenth.   That the decree is in other respects irregular, informal and erroneous.

As to the first and second grounds of appeal : By the account settled in 1869, there appeared to be a balance against the executors of $32,652.62 ; in the final account the balance which is brought forward from that account is only the sum of $6,565.16.  · The difference appears to have been occasioned by the deduction from the balance of the first account of sums of money which the executors had failed to collect upon mortgages which constituted part of the inventory, and which were subsequently foreclosed, and large deficiencies left after the sale of the mortgaged property.   If the executors were not chargeable with the deficiencies, then there is no error in this method of settlement, for the final account shows the true balance with which the executors were chargeable at the filing of the account, in respect to those things which entered into the former account.

As to the third : The appellant claims that the mortgage for $6,921.61, given by Edgar M. Smith to the testator in 1853, should be accounted for by the executors as having been collected by the estate, inasmuch as it appears, by the entry upon the record of the mortgage, that it was receipted after the testator's death, in the name of the executors, by Anthony Dey, Jr., their agent, upon which receipt, and the production of the mortgage, the latter was canceled January 12th, 1860.   It appears very clearly by the evidence that this mortgage had been paid off before the testator's death.   It was given to secure the payment of nine notes, altogether for $6,921.61, maturing, the earliest in 1853, and the latest in March, 1855.   The testator died in August, 1859, four years after the maturity of that one of those notes which had the longest time to run.   It appears, by

Dey v. Codman.

the testimony of James R. Dey, son of the testator, that the
notes were all paid. He appears to have been conversant with
his father's business, particularly with regard to the mortgage in
question, which had its origin in his discovery of an error in
computation of an account between his father 'and persons
with whom he was interested in real estate transactions. He
swears that his father told him that they were all paid. He
qualifies the statement, however, by saying that what his
father said was, that he had no more of the notes—that is, that
he had used them up. He further testifies that the notes were
not all paid at maturity, though some of them were. The origi-
nal mortgage was not produced. We are, therefore, without the
advantage of knowing what endorsements of payments (if any)
were put upon it by the testator. It is clearly shown that no
money was received by the executors in consideration of the re-
ceipt before mentioned, given in their behalf. The mortgage
appears to have been in the hands of the late Abraham O. Za-
briskie, as attorney for some one. He applied to Anthony Dey,
Jr., the agent of the executors, to have it canceled, on the as-
sumption that it was paid, and the receipt before mentioned
was given. Mr. Dey swears that the mortgage was never in
possession of himself or the executors; that he presumes that
he signed the acquittance on the production of the notes, and
that neither he nor the executors received anything in considera-
tion of the cancellation or receipt. It will be observed that the
mortgage was canceled in 1860, more than twenty years ago.

The fourth and fifth grounds were not presented for adjudica-
tion on the argument.

As to the sixth : The appellant insists that the executors
should not be allowed for taxes paid and repairs or improve-
ments made on the homestead after the widow ceased to reside
therein. By the will the testator provides that the homestead and
such of the furniture therein as belonged to him, should be held
by his executors and trustees in trust for the use and occupation of
his wife so long as she might live and remain his widow, and for
such of his daughters as might remain unmarried or be in a

state of widowhood, for and during their natural lives, and that
after the death of the survivor of them, the property should be
sold for the best price that could be had therefor, at public auc-
tion or private sale, and the proceeds fall into the residue of his
estate ; and that if the persons entitled to the use and occupa-
tion of the estate might desire to sell it and remove from it, or
if at any time they should unanimously agree to sell and quit the
property, then they might do so, and the proceeds should be
divided among such of them as were entitled to his residuary
estate.    It appears that the widow ceased to occupy the home-
stead before her death, which occurred April 12th, 1871 ; that
she rented the property from the time she left it until her death,
and took the rents for her own use, her construction of the de-
vise just quoted being that she was entitled for life to the use
of the property, either personally or by her tenants. Under such
a gift, the donee is not confined to the personal use of the prop-
erty, so that he is debarred from letting it during the conti₁.-
ance of his interest.    *King* v. *Eatington, 4 T. R. 177 ; Rabbeth*
v. *Squire, 4 De G. & J. 406 ; Ingersoll* v. *Ingersoll, 9 Stew. Eq.
127.*

But the widow in this case was bound, as equitable life-tenant,
to pay the taxes and all necessary repairs.    It appears from the
evidence that she paid the taxes so far as her means would allow,
and the balance was paid by the executors.    It would seem that
the repairs and improvements which were put on the property
were also paid for by the executors out of the estate.    The prop-
erty was not sold until about ten years after the death of the
widow, but it is to be remembered that the title was clouded by
the provision for the benefit of the testator's daughters, either
while unmarried or when they should become widows.    The evi-
dence in the case is not such as to warrant charging the executors
with any rent for the property after the death of the widow, or
to justify a refusal to allow the executors for the repairs and im-
provements.

The seventh ground of objection is, that the court has allowed
for the salary of Anthony Dey, Jr., agent of the executors in the
business of the estate.

It is enough to say on this head that it appears that the fact that the salary was paid out of the estate to this agent was taken into account in fixing the amount of the commissions of the executors.  The settlement of the estate began in 1859, and the account was filed in 1880.  So it appears that twenty-one years, or thereabouts, elapsed from the beginning of the settlement of the estate until its termination.  For the compensation of the agent $4,200 in all were allowed; in addition whereto, commissions to the amount of only $2,288.06 were allowed to the executors.  The commissions allowed in the account of 1869 were $1,820.90; in the final account, $467.16.  The executors were entitled to commissions upon about $160,000; the commissions on which, at five per cent., would be about $8,000.  The salary of the agent and the commissions allowed are less than $6,500 altogether.  The objection is made, in this connection, to the allowance of traveling expenses to the executors.  The amount is not large under the circumstances.  The expenses appear to have been *bona fide* incurred and paid, and they are allowable in addition to commissions.  The statute provides for the allowance of commissions over and above the actual expenses.  *Rev. p. 776 § 110.*

Eighth.  The appellant insists that the executors ought not to be allowed for the amount of certain municipal assessments paid by them on certain lots of land of the estate in East Newark.  These payments were made in 1872, 1874 and 1876.  The ground of objection is that the acts under which those assessments were made did not limit the assessment of benefits to the advantage derived by the property from the municipal improvement.  It is to be remembered that the decision which established the unconstitutionality of such provisions in municipal charters was not made until March, 1874, and that it reversed the decision of the supreme court sustaining an assessment under such a provision.  *Agens* v. *Newark, 6 Vr. 168, 8 Vr. 415.*  So that, when the assessment of 1872 was paid, such legislation had not passed under judicial condemnation.  As to the other two assessments, it will be enough to say that the executors appear in this matter, as in all other things in their management of the

estate, to have acted in entire good faith, and to have exercised care and discretion in their dealings with reference to it. These payments were not only made in good faith, but it appears they were made by the advice of counsel. They were made in respect to municipal improvements, the benefits of which were to be reaped by the property.

The ninth ground of appeal is that the executors refused an offer of $30,000 for the East Newark property, and afterwards sold the property for $1,470 over and above taxes and assessments; so that, as the appellant insists, a loss of over $28,500 occurred to the estate from their mismanagement. As has just been said, it appears that the executors acted *bona fide* in all their transactions touching the estate. The offer of $30,000 cash was made to Dr. Nichols, one of the executors, about 1873, by Joseph M. Duclos. He declined it on the ground that it was not sufficient—that the property was worth far more. Subsequently, Dr. Nichols met Mr. Duclos, and requested him to make another offer of a larger sum, and the latter testifies that he believes he went again to see Dr. Nichols in 1874, and that then he offered him a little more than $30,000. There were about one hundred and thirty lots in the property, all unimproved. With a view to their guidance in disposing of this property, the executors had employed a competent person, Edward M. Reilley, living in East Newark, and well acquainted with the value of real estate there, to make an estimate of this property, in order that they might understandingly fix a price upon it, with a view to selling it for the benefit of the estate. The value of the property was fixed by that person at $95,000. They requested him to reconsider the matter, and fix such a price upon the property as would invite buyers. He did so, and reduced the valuation to about $65,000. When Mr. Duclos made his offers for the property they were declined merely because they were not more than about one-third of the value of the property as fixed by Mr. Reilley, and not one-half of the amount fixed by the same person when he put the valuation so low as to tempt buyers.

The refusal to accept the offers was, as the executors believed at the time, in the interest of the estate, in which both Dr.

,Dey *v.* Codman.

Nichols and Captain Codman were interested through their wives, who were daughters of the testator. Shortly after the refusal the panic of 1873 came, and there was no longer any sale for such property. It appears by the evidence that the taxes and assessments were left unpaid on the property because of want of funds of the estate wherewith to pay them, and that, for the purpose of closing up the estate, it was determined by the executors to sell the property for the best price that could be got for it. It was extensively advertised for several weeks, and every effort made to sell it at a good price. The result, however, was that it was sold to Mr. Richards. The sale was a public one, and he was the highest bidder. There was an understanding,. however, between him and those interested in the property, with the exception of the exceptant (whose interest is one thirty-second part), that he took the title in trust for the persons interested in the property under the will, to make a fair and satisfactory division thereof among them. The evidence shows, it may be observed, that he has made a division and conveyance to all except the appellant, who has refused to accept a conveyance or in any wise recognize the validity or propriety of the sale. Under the circumstances, in view of the fact that the refusal to accept the offers made by Duclos in 1873 and 1874 was due to a desire on the part of the executors to get a fair price for the property, and that the low price at which it sold, subsequently, was due to the depreciation in real estate, especially property of that character, which began in 1874 or thereabouts, and continued for many years, there is no ground for charging the executors with the difference between the price for which the property could have been sold to Duclos and the price at which it was actually sold, subsequently. Such a charge must necessarily be based upon bad faith or gross mismanagement. It is impossible to find either in this transaction.

The same considerations apply to the sale of the homestead. In that case, it should be added, there was hindrance to the sale of the property from the fact of the existence of the interests of the daughters of the testator therein. It may be further remarked that in regard to both of these sales the question of lia-

bility of the executors was considered and passed upon by the court below, upon an examination into all the facts, the same which are now before me, and that, in their judgment, the executors incurred no liability in the transaction for damages for fraud or the mismanagement of the estate.

The eleventh ground of appeal was not mentioned upon the argument. That objection appears to have been based upon mistake.

The twelfth is an objection to the allowance to T. P. Ranney of $300 for brokerage on the sale of real estate by the executors, through him, for $15,000. It appears, by the evidence, that Mr. Ranney, who was the attorney and counsel for the executors, had interested himself to find a purchaser for the property for the executors, and had secured one. For these services he demanded commissions by way of brokerage, which were paid to him accordingly. There is no good ground for disallowing the charge.

The thirteenth ground is in reference to the non-collection of deficiencies on sale of the mortgaged premises. There is no proof that the deficiencies could in any case have been collected. All the evidence on the subject is to the contrary.

The fourteenth is an objection to the allowance of counsel fees, because it does not appear what services were rendered for them. This objection, so far as it affects the allowances in the first account, cannot be entertained. The question of the propriety of those allowances was before the court when that account was passed, in 1869, and though evidence has been introduced to show the propriety of those charges (of which there seems no room to doubt), it should be said that as to them the account of 1869 must be regarded as conclusive. *Reynolds* v. *Jackson, 9 Stew. Eq. 515.*\* And as to those appearing in the final account, the services are sufficiently shown, and they ought to be allowed.

The fifteenth refers to the commissions, and objects to them on the ground that the allowance is excessive, and it objects, also, to two charges of $944.45 for money paid July 28th, 1869, to

---

\* Note.—This case has been reversed. See *Jackson* v. *Reynolds, 12 Stew Eq.* —Rep.

Dey v. Codman.

John Codman and Isaac A. Nichols, the executors, respectively.. Enough has been said already on the subject of the allowance of the commissions. The two charges referred to appear to have been intended to be for the commissions allowed in the first account, $1,820.90, which had been divided between the two executors. There was, however, an error of $68 in the computation; the two sums of $944.45 together amounting to $1,888.90 instead of $1,820.90, the amount allowed. This the orphans court corrected by directing a reduction of $68 in respect to those· two items. The reason for charging those commissions in the final account, although they had been allowed in the first account, appears to have been as follows: The balance shown by the first account was $32,652.62, of which $27.968.41 were the amount of the inventory. In that account the executors were charged with the amount of the inventory, and also with the cash balance in their hands of $6,565.11, altogether $34,553.52 ;. from which were to be taken the commissions, $1,822.90, allowed in that account, and $60 for the surrogate's fees for auditing the· account, altogether $1,880.90; leaving a balance of $32,652.62, which was made up of cash, $4,684.21, and the amount of the inventory, $27,968.41. Although the commissions allowed in· the first account and the amount of the surrogate's fee were deducted from the credits of that account, in the final account the executors were charged with the entire cash balance before mentioned, $6,565.11, and credited with the amount of commissions and surrogate's fees. The reason for the credit was, it will be seen, the fact that the entire cash balance on the first account was credited on the second.

The sixteenth ground is, that the accounts are incomplete, fragmentary and unintelligible. This objection, except as to the apparent discrepancy arising from the difference between the balance charged against the executors in the first account and that charged against them in the second, is not well taken; but in that respect the account is faulty and ought to be corrected.

The seventeenth ground is, that the court should have decreed that, inasmuch as the executors were individually interested in the sales of the real estate, the sales were illegal, and that it

should have charged them with loss occasioned to the estate by reason of the failure to sell when a better price could have been obtained. This objection has already been considered under another head.

The last ground is merely the usual general objection of irregularity, informality and error. After what has been said on the subject of the other grounds, it needs no attention.

The decree of the orphans court will be affirmed; the costs of both sides to be paid out of the estate. The final account should, however, be restated so as to explain the discrepancy before mentioned.